Filed 6/27/24  P. v. Ware CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>v.<br><br>JAMES WARE, JR.,<br><br>　　Defendant and Appellant. | B325679<br><br>(Los Angeles County<br>Super. Ct. No. PA083082) |

APPEAL from a judgment of the Superior Court of Los Angeles County, David Gelfound, Judge.  Affirmed in part, reversed in part, and remanded.

Laini Millar Melnick, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, David A. Voet, Deputy Attorney General, for Plaintiff and Respondent.

Defendant and appellant James Ware, Jr. (defendant) is before this court on appeal for a fourth time after three earlier partial or conditional reversals of the criminal judgment against him. Most recently, this court conditionally reversed the judgment of conviction and directed the trial court to decide defendant's motion for mental health diversion under Penal Code section 1001.36.[1] (*People v. Ware* (B301990, Apr. 21, 2021) [nonpub. opn.] (*Ware III*).) The trial court denied the motion based solely on its finding that defendant poses an unreasonable risk of danger to public safety if diversion were granted. The court then reinstated the 35 years to life prison sentence for defendant—ten years of which is attributable to two five-year enhancements under section 667, subdivision (a) for sustaining prior serious felony convictions. We are asked to decide whether the trial court's unreasonable risk of danger finding was error and whether we must again remand the cause so the trial court can consider whether to dismiss the prior serious felony conviction enhancements under prevailing law as recently amended by Senate Bill No. 81 (2021-2022 Reg. Sess.) (SB 81), which was enacted so courts would more frequently dismiss such enhancements.

---

[1] Undesignated statutory references that follow are to the Penal Code.

# I.  BACKGROUND

### A.     *The Offense Conduct Ultimately Resulting in Defendant's Conviction for Attempted Criminal Threats*

For the sake of completeness, we reiterate the summary of defendant's offense conduct included in our prior opinions.

Early in the morning on February 26, 2015, defendant's mother called 911 to report defendant was causing a disturbance at her house and refusing to leave the property.  Defendant left the scene before the responding police officers arrived.

Later that same morning, defendant's brother Rick spoke to defendant by phone and recorded the call without telling defendant he was doing so.  Rick placed the call on speakerphone so their mother, who was also in the house, could listen in.

Defendant said he wanted to come over to the house so he could eat, take his diabetes medication, and shower before going to school.  Rick refused to give defendant permission to enter the house, explaining it was not his house (it was their mother's) and reminding defendant he would "assault everybody" whenever he came over.  Defendant then began arguing with Rick, and Rick repeatedly told defendant he should get counseling or enter a treatment program to address his substance abuse and mental health issues.  Defendant eventually hung up on Rick.

When defendant called Rick back, Rick again surreptitiously recorded their conversation.  Defendant told Rick he was "so mad" and "really want[ed] that house to burn down."  Defendant elaborated, using even more vivid language:  "I got a Molotov cocktail right here.  I've got a lighter in my hand, Ricky.  And—and I—I got a great big old 40-ounce bottle full of gas, and I'm going to burn your house down, man."  Rick responded by

3

telling defendant "we really care about you" and "[w]e want you to go to counseling."

Defendant, however, was far from done. Over the next ten-plus minutes, he repeatedly threatened Rick and the other occupants of the house, stating at one point: "I hate you so much that I could really trap with you [sic] motherfuckers in there right now and burn that house down. That's how I'm feeling right now. You know what I mean? But you want to talk to me about a fucking [counseling] program? [¶] . . . [¶] I'm tired of this motherfucking shit. I'm tired. You think I'm going to—the next time I go to jail, I just want you motherfuckers to know, yeah, I deserve that. So whatever life sentence I get or whoever die[s], whatever happen[s], man, you all—you all brought this shit on yourself, man, you know? [¶] . . . [¶] "I want you dead, man. I want your mama dead and your fucking daughter, man, and I'm going to kill you motherfuckers . . . . I'm going to show you motherfuckers what real hate is, you know. [¶] . . . [¶] I don't want to beg. I don't want to—you know what, fuck being, I don't even want to fucking be alive. You know what I mean?" Throughout this portion of defendant's tirade, Rick did not respond to defendant's threats other than to reiterate defendant should enroll in a counseling program and to extol the virtues of such a program, e.g., that a residential program would provide defendant with food and an opportunity for Bible study.

The phone conversation continued. Defendant told Rick he was standing on the roof of the house and could "light all the exits on fire and you motherfuckers won't even be able to get out." Defendant asked Rick, "Do you hear me on the roof, Ricky?" Rick responded, "Nope," and followed up with, "Hey Jamie, the

4

program is going to be great for you." Defendant's retort was to tell Rick his "car is on fire already"; in fact, it wasn't.

Defendant asked to speak to his mother, and she told defendant he should go to school and go to counseling. After defendant continued to protest being kept out of the house and told Rick he "lit your house on fire," Rick responded, "Jamie, this is terrorism." Defendant said he didn't care and told Rick maybe he (defendant) could eat in jail; Rick responded that he thought "it would be better in a program." The conversation ended when Rick indicated he was going to get off the phone and would see defendant after his "little program"; defendant replied, "you have a nice day."

Sometime after the call between defendant and Rick ended, Rick called 911. Rick told the 911 operator his mother asked him to call because defendant had come to the house and damaged a door while trying to break in. Rick's mother, who also spoke to the 911 operator during the call, explained defendant broke the door frame but couldn't get the door all the way open. In response to the operator's questions, Rick said defendant was still trying to get in the house and seemed like he was on drugs. At the end of the call, the operator told Rick and his mother to call back if anything else happened, and the recording ends with Rick's mother saying, "I smell um, I smell."

Rick called 911 again approximately ten minutes later. He told the operator he thought defendant "just poured gasoline all over, [and] he's trying to burn the house down." The operator asked, "And you said he put gas all over the house?" Rick responded, "Y[eah], we have a tape of the thing. And he did it. And he burst the door down trying to get in." Rick then said, "It really smells like gas, or something in here. But we can't go out

because he's out there. Yea[h], he's coming back and forth across the street from the neighbors house, they're also . . . felons." The 911 operator told Rick that the police were being sent to his location and the fire department was also being notified.

Rick told responding police officers that defendant broke the door and tried to get in the house. One of the officers examined the house's side door and found the jamb had been cracked in a way consistent with someone hitting or kicking the door. During their inspection of the property, the officers could smell gasoline when standing in the area of the home's side door and front door, and a piece of carpet in front of one of the doorways later tested positive for the presence of gasoline. The responding officers took defendant into custody and found a lighter in his front pocket during a search of his person.

> B. *The Procedural History Before the Most Recent Trial Court Proceedings on Remand*

The Los Angeles County District Attorney charged defendant with making criminal threats (§ 422, subd. (a)) and attempted arson (§ 455). Before trial, the People offered defendant a plea deal whereby the prosecution would recommend a six-year prison sentence if defendant pled guilty or no contest to the criminal threats charge. Defendant rejected that deal but thereafter agreed to an even more favorable agreement, which the then-presiding trial judge initially approved, that would result in a probationary sentence (by striking both of his prior convictions for serious or violent felonies under the Three Strikes law) with a requirement that defendant enroll in a one-year, live-in "dual diagnosis" program. After defendant expressed what the trial court understood as some reticence about whether he

had a drug problem, however, the trial court withdrew its approval of the plea agreement and set the case for trial.

The trial jury found defendant guilty of making criminal threats but not guilty of attempted arson. The jury further found defendant had sustained three prior serious or violent felony convictions in 1992: one for voluntary manslaughter and two for assault with a deadly weapon (both of which were sustained in the same criminal proceeding). The trial court sentenced defendant to a prison term of 35 years to life: 25 years to life for the criminal threats conviction, pursuant to the Three Strikes law (sections 667, subdivisions (b)-(i) and 1170.12), plus two consecutive five-year terms under section 667, subdivision (a)(1) for the qualifying prior serious felony convictions. We later reversed the criminal threats conviction for instructional error and the People accepted a reduction of the conviction to attempted criminal threats. The trial court, at resentencing in January 2018, made no change in defendant's 35 years to life sentence.

Defendant again appealed, arguing the trial court should have granted a renewed *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 motion made at resentencing and we should remand to give the trial court the opportunity to strike the section 667, subdivision (a)(1) prior serious felony conviction enhancements pursuant to the change in law worked by Senate Bill No. 1393 (2017-2018 Reg. Sess.), which gave trial courts discretion to dismiss such enhancements in the interests of justice. In February 2019, we "remanded for the trial court to consider whether it wishes to exercise its discretion to strike, under section 1385, one or both of defendant's section 667,

7

subdivision (a)(1) enhancements" but affirmed in all other respects.

On remand, defendant asked the court to exercise its discretion to dismiss both of his serious prior conviction enhancements because, among other things, they were remote (27 years old) and because he suffers from "mental illness issues." Defendant also moved the court "to conduct a diversion eligibility hearing under . . . section 1001.36 to qualify [defendant] for mental health diversion."[2]  Section 1001.36 had been enacted in June 2018 (Stats. 2018, ch. 34, § 24), i.e., in the period between

---

[2]     Section 1001.36 permits a trial court to grant mental health-based pretrial diversion "if it finds all of the following: (1) the defendant suffers from a qualifying mental disorder [including, but not limited to, bipolar disorder and schizophrenia]; (2) the disorder played a significant role in the commission of the charged offense; (3) the defendant's symptoms will respond to mental health treatment; (4) the defendant consents to diversion and waives his or her speedy trial right; (5) the defendant agrees to comply with treatment; and (6) the defendant will not pose an unreasonable risk of danger to public safety [as defined in section 1170.18] if treated in the community."  (*People v. Frahs* (2020) 9 Cal.5th 618, 626-627; see also § 1170.18, subd. (c) ["'[U]nreasonable risk of danger to public safety' means an unreasonable risk that the petitioner will commit a new violent felony within the meaning of" section 667, subdivision (e)(2)(C)(iv); *People v. Valencia* (2017) 3 Cal.5th 347, 351 ["The cited subdivision of section 667 identifies eight types of particularly serious or violent felonies, known colloquially as 'super strikes'"].)  Section 1001.36 further provides that criminal defendants charged with certain offenses—murder, voluntary manslaughter, and several sex offenses—are automatically ineligible for relief.  (Former § 1001.36, subd. (b)(2).)

defendant's January 2018 resentencing and our February 2019 remand for consideration of Senate Bill No. 1393 discretion.

The trial court denied all relief sought by defendant and stated it would not change the existing 35 years to life sentence. Regarding the prior serious felony conviction enhancements defendant asked the court to strike, the court declined to exercise its discretion in defendant's favor in light of his "long history of violence" and "numerous violations of probation and parole." As for defendant's request for mental health diversion, the court believed it was prohibited from considering the issue in light of the scope of our remittitur but it additionally remarked that it did not believe sufficient evidence established defendant's mental disorder played a significant role in the commission of his offense of conviction.

On appeal in *Ware III*, the Attorney General conceded the trial court erred by not reaching the issue of whether defendant was entitled to mental health diversion. We agreed and held the trial court's error in failing to decide the motion for diversion was not harmless because, among other reasons, it was not clear the trial court's observations about defendant's mental health reliably translated to a determination that defendant could not show his asserted mental illness played a significant role in the commission of his attempted criminal threats offense.

We therefore remanded to give the trial judge an opportunity to determine whether mental health diversion was appropriate and to state the reasons for its decision. We expressed no view on whether such relief should be granted. In addition, and because the trial court's mental health diversion determination might moot the question of whether it erred in declining to dismiss defendant's two five-year prior serious felony

conviction enhancements, we "defer[red] resolution of that question for a fourth appeal, if such an appeal is filed." Our disposition stated: "The order denying defendant's motion for retroactive mental health diversion is conditionally reversed and the cause is remanded to the trial court for further proceedings consistent with this opinion. If, after a hearing, the trial court finds defendant suffers from a mental disorder, does not pose an unreasonable risk of danger to public safety, and otherwise meets the six statutory criteria (as nearly as possible given the postconviction procedural posture of this case), then the court may grant diversion. If defendant successfully completes diversion, then the court shall dismiss the charges. If, however, the court determines defendant does not meet the criteria under section 1001.36, or if defendant does not successfully complete diversion, then his convictions and sentence shall be reinstated."

C.      *The Proceedings at Issue in This Appeal*

The fourth appeal we contemplated in *Ware III* is the one before us now. At an evidentiary hearing held in September 2022 pursuant to the disposition in *Ware III*, the trial court ruled on the merits of defendant's request for mental health diversion. It did not, however, make further findings on the imposition of the two prior serious felony conviction enhancements challenged in *Ware III*. Instead, "per the remittitur," the court just reinstated the same 35 years to life sentence.

In denying defendant's motion for mental health diversion, the trial court relied solely on its finding as to the sixth statutory criterion, i.e., that defendant would pose an unreasonable risk of danger to public safety, as defined in section 1170.18, if treated in the community. (Former § 1001.36, subd. (b)(1)(F).) In so

10

finding, the court reviewed defendant's criminal history on the record, including 1992 convictions for assault with a deadly weapon, a 1992 conviction for voluntary manslaughter with a personal use of a firearm enhancement,[3] a 1995 domestic violence felony conviction, a 2002 conviction for possession of a device for arson, a 2003 conviction for battery on a police officer, a 2004 conviction for possessing a deadly weapon in prison, and the underlying attempted criminal threats offense committed in 2015. The court additionally noted defendant had a history of violating parole or probation and explained defendant had "a continuous record [of committing crimes] from [1991] to 2004. He then serves a lengthy prison sentence, gets released; and, while on probation, he picks up a new offense, which he's been incarcerated [on] since 2015. [¶] So he's got a history of committing violence. The argument that he's gone a long time without committing anything, he'd been incarcerated." The court further observed that defendant had already taken the life of another person in his past (the voluntary manslaughter conviction) and had a history of assaultive and "very violent behavior."

---

[3]   The prosecution's opposition to defendant's request for mental health diversion informed the court that defendant pled guilty to the voluntary manslaughter charge only after a trial jury hung on a murder charge and the judge sentencing defendant for the manslaughter offense remarked on the record that defendant was "lucky" because he believed the crime was "a cold blooded murder."

## II. DISCUSSION

We review a trial court's denial of a section 1001.36 motion for mental health diversion for abuse of discretion. (*People v. Fuller* (2022) 83 Cal.App.5th 394, 400.) Under that deferential standard, the trial court did not err in denying defendant's diversion motion. Defendant's criminal history—including a manslaughter conviction, several assaultive offenses, and possession of a deadly weapon in prison—suffices to support the trial court's conclusion that he poses an unacceptable risk of committing a "super strike" crime if treated in the community.

Remand is still required, however. The trial court imposed the two section 667, subdivision (a) prior serious felony conviction enhancements when reinstating defendant's sentence. This being defendant's fourth direct appeal from the reinstated judgment, he is entitled to the benefit of SB 81, which provides a significantly more defendant-favorable standard for considering whether to exercise discretion to dismiss a section 667, subdivision (a) enhancement. We therefore remand to allow the trial court to decide, in the first instance, whether dismissal of those enhancements is warranted under prevailing law.

### A. *Denial of Mental Health Diversion Was Not an Abuse of Discretion*

As mentioned in the margin earlier, section 1001.36 gave the trial court discretion to grant mental health diversion if it was "satisfied that the defendant will not pose an unreasonable risk of danger to public safety, as defined in Section 1170.18, if treated in the community. The court may consider the opinions of the district attorney, the defense, or a qualified mental health expert, and may consider the defendant's violence and criminal

12

history, the current charged offense, and any other factors that the court deems appropriate." (Former § 1001.36, subd. (b)(1)(F).[4]) The unreasonable risk of danger, as defined, is an unreasonable risk that the defendant would commit a new violent felony within the meaning of section 667, subdivision (e)(2)(C)(iv).[5] (§ 1170.18, subd. (c).)

Here, there is no basis to overturn the trial court's determination that defendant would pose just such an unreasonable risk of danger if treated in the community. The court considered the opinions of the prosecution, the defense, the testimony of the defense's mental health expert who testified at

---

[4] A substantively similar provision appears in the current version of section 1001.36, just in a different place. (§ 1001.36, subd. (c)(4).) Our analysis is the same under either version of the statutory subdivision.

[5] The "super strikes" therein listed are: (1) a "'[s]exually violent offense,'" as defined in Welfare & Institutions Code, section 6600, subdivision (b); (2) oral copulation or sodomy, or sexual penetration of a child under 14 years of age and more than 10 years younger than the defendant, as defined in sections 286, 288a and 289; (3) a lewd or lascivious act involving a child under 14 years of age, in violation of section 288; (4) any homicide offense, including attempted homicide, as defined in sections 187 to 191; (5) solicitation to commit murder, as defined in section 653f; (6) assault with a machine gun on a peace officer or firefighter, as defined in section 245, subdivision (d)(3); (7) "[p]ossession of a weapon of mass destruction, as defined in paragraph (1) of subdivision (a) of [s]ection 11418"; and (8) any serious and/or violent felony offense punishable in California by life imprisonment or death. (§ 667, subd. (e)(2)(C)(iv)(I–VIII); *Valencia, supra,* 3 Cal.5th at 351, fn. 3.)

the evidentiary hearing the court held on remand,[6] and rather voluminous written materials submitted by the defense. The record before the trial court established defendant previously came close to sustaining a prior super strike conviction (voluntary manslaughter after a hung jury on a murder charge), made repeated threats to commit murder during the underlying attempted criminal threats offense, had a history—both in prison and out—of possessing or using deadly weapons, had multiple convictions for assaulting others, and had a consistent history of committing crimes, even while on probation or parole, that abated mainly just during the periods when he was in custody. That, in our view, provides a sufficient reasoned basis for the trial court to believe defendant posed an unreasonable risk of committing a super strike like murder, attempted murder, or solicitation to commit murder if given diversion. (See, e.g., *People v. Hall* (2016) 247 Cal.App.4th 1255, 1264-1266 [affirming a trial court's unreasonable risk of danger finding under section 1170.18 based on the defendant's expressed willingness to use deadly force when committing robberies and the "'continual and consistent escalation'" in the defendant's criminal activity].)

---

[6] The expert, Risa Grand, while acknowledging she was not a "psychic or a mind reader," opined defendant would not pose an unreasonable risk of danger to the public. She testified, however, that if given diversion, defendant would need to be in a "locked setting."

14

### B. Remand is Required to Permit the Trial Court to Decide Whether to Dismiss the Prior Serious Felony Enhancements Under the Law As Amended by SB 81

"Enacted in 2021 [and effective as of January 1, 2022], [SB 81] amended Penal Code section 1385 to guide sentencing courts in deciding whether to dismiss an enhancement. [Citation.] Under new section 1385(c), a court 'shall dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute.' [Citation.] In deciding whether to strike the enhancement, 'the court shall consider and afford great weight to evidence . . . that any of [nine enumerated] mitigating circumstances . . . are present.' [Citation.] 'Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety.' [Citation.]" (*People v. McDowell* (2024) 99 Cal.App.5th 1147, 1152-1153.) Among the specified mitigating circumstances are the circumstances when the "current offense is connected to mental illness" (§ 1385, subd. (c)(2)(D)); when more than a single enhancement is alleged (§ 1385, subd. (c)(2)(B)); when the current offense of conviction is not a violent felony as defined in section 667.5, subdivision (c) (§ 1385, subd. (c)(2)(F)); and when the enhancement is based on a prior conviction that is over five years old (§ 1385, subd. (c)(2)(H)). SB 81 expressly provides that its amendments to section 1385 "shall apply to all sentencings occurring after January 1, 2022." (§ 1385, subd. (c)(7).)

Defendant argues the cause should be remanded to allow the trial court to consider dismissal of his two section 667, subdivision (a) enhancements under section 1385 as amended by

SB 81—including the four specific mitigating circumstances just discussed. The Attorney General concedes defendant's "case is not yet final" but believes the issue does not turn on a question of retroactivity given SB 81's express provision that it applies only to sentencings occurring after January 1, 2022. In the Attorney General's view, defendant's sentence was imposed before January 1, 2022, the disposition in *Ware III* merely directed reimposition of that sentence, and SB 81 therefore does not apply.

The Attorney General misunderstands the import of what occurred on the most recent remand. As a result of our decision in *Ware III*—in which we explained the propriety of the section 667, subdivision (a) enhancements was deferred for another appeal, if necessary—the criminal judgment against defendant was conditionally reversed. We directed the trial court to *reinstate* the judgment if it denied mental health diversion, and before the court did just that at the hearing in September 2022, there was no pending judgment against defendant. Thus, in our view, the September 2022 hearing qualifies as a sentencing (no matter how perfunctory) occurring after January 1, 2022. That means SB 81 does apply to defendant and a remand is required to permit the trial court to decide, in the first instance, whether to dismiss the section 667, subdivision (a) enhancements under current law. (See *People v. Ochoa*, 53 Cal.App.5th 841, 853.)

Because we shall remand for this purpose, we can resolve defendant's remaining contentions with dispatch. We need not discuss defendant's other arguments challenging imposition of the section 667, subdivision (a) enhancements or his contention that Assembly Bill No. 2167 (2021–2022 Reg. Sess.) is retroactive. We reject as groundless defendant's request that a different trial judge be assigned to decide the matter on remand.

16

(See, e.g., *People v. Crew* (1991) 1 Cal.App.4th 1591, 1609, fn. 13 ["[R]emand to a different judge is not warranted due simply to the possibility that one side or the other may feel unfairly treated"].)

## DISPOSITION

Defendant's sentence is reversed and the cause is remanded for resentencing—at which the trial court shall determine whether section 1385, as amended by SB 81, requires dismissing one or both of the section 667, subdivision (a) enhancements alleged against defendant and found true. In all other respects, the judgment is affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

BAKER, Acting P. J.

We concur:

MOOR, J.                                             LEE, J.[*]

_____

[*]      Judge of the San Bernardino County Superior Court, assigned by the Chief Justice pursuant to Article VI, section 6 of the California Constitution.